**GREAT AMERICAN HOMES, INC.,**
**Plaintiff-Appellee,**

v.

**Mozelle Reid FARLEY, William S. Farley, and Ethleen Farley Butler, Defendants-Appellants.**

Court of Appeals of Tennessee, Western Section, at Jackson.

Nov. 9, 1984.

Rehearing Denied Nov. 27, 1984.

Application for Permission to Appeal Denied by Supreme Court April 29, 1985.

Fred E. Jones, Memphis, for defendants-appellants.

David E. Caywood and Daniel Loyd Taylor, Memphis, for plaintiff-appellee.

BROOKS McLEMORE, Special Judge.

This case is before us to review the construction of a contract and the amount of credits due under that contract, as well as the method of allowing such credits.

The parties, defendants-sellers and plaintiff-buyer, entered into a contract for the sale of 292 + acres of land, at $4,500.00 per acre, representing a sale price of $1,314,000.00. At the closing, the plaintiff-buyer signed a deferred purchase money promissory note payable to the defendants-sellers in the sum of $1,088,775.00. The real estate sale contract and the applicable provisions of the note, among other things, provide that the plaintiff-buyer is to be credited in that the sale price will be reduced for all costs that may be experienced to raise the land to satisfactory elevations which may be required above the one hundred year flood area. Only a portion of the land was in the flood area, the buyer's estimate being 90 acres.

The applicable provisions of the real estate sale contract are:

It appears that the land is penalized by the published 100 year flood elevation requirement in the Fletcher Creek basin, this offer is subject to the cost that may be experienced to raise any of the land area to satisfactory elevations which may be required above the 100 year flood area meaning that this cost due to raising the land to the satisfactory elevations will reduce the sales price offered accordingly. All land that has to be used for constructing a ditch to come into compliance with the 100 year flood plain, will be deeded to the purchaser without cost, which is believed to be approximately 10 acres.

The applicable provisions of the promissory note are:

Payment of this note is subject to the applicable conditions of the real estate contract (including its addendum) dated April 16, 1979 between the maker and the beneficiaries of this note. Payment of this note shall be reduced by amount of the costs experienced to raise the land as described in the aforementioned con-

tract to the satisfactory elevations as may be required by the 100 year flood elevation requirement in the Fletcher Creek basin. Payment of this note shall also be reduced when it is determined how much land is in the ditch that must be constructed on the aforementioned land, the amount of acreage in said ditch—will be multiplied by $4,500 per acre and then subtracted from the amount of this note.

It is uncontroverted that the "one hundred year flood plain" is that as designated by the Corps of Engineers' maps.

It is uncontroverted that some sort of ditch plan was to be used to raise the land above the one hundred year flood area.

Plaintiff-buyer and defendants-sellers entered into the sales contract on April 16, 1979, and closed the transaction on August 21, 1979. On June 9, 1980, the buyer made a demand on the sellers for total credits in excess of $800,000.00 against the principal balance of the promissory note in the original sum of $1,088,775.00. This amount being in controversy, on March 17, 1981, a complaint for declaratory judgment was filed by plaintiff-buyer.

It was understood at the hearing that the method to be used by the plaintiff-buyer in raising the land out of the flood plain would be one of a system of lakes rather than by the construction of a ditch. It was also understood at the hearing that this system of lakes would be more expensive than a ditch method. The theory of both parties was that the amount of credits would depend upon the cost of raising the land out of the flood plain by a ditch method, and both parties offered their proof by expert testimony as to this cost. The expert testimony as to the proper method of preparing the ditches was sharply conflicting. There was a wide difference in the cost estimates.

The Chancellor, after evidentiary hearing, approved the method designed by the plaintiff-buyer's experts, and after considering reports of the Master rendered judgment for credits as follows:

| | | |
|---|---|---:|
| 1. | 132,560 cubic yards of dirt must be excavated at a cost of $1.25 per cubic yard | $165,700.00 |
| 2. | Invert and slope protection cost is as follows: | |
| | (a) Fletcher Creek Slope Protection 35,262 sq. ft. at $3.00 sq. ft. | 105,786.00 |
| | Gabion Weirs 145 CY at $100 CY | 14,500.00 |
| | (b) Lateral "A" Slope Protection 29,289 sq. ft. at $3.00 sq. ft. | 87,867.00 |
| | Gabion Weirs 145 CY at $100 CY | 14,500.00 |
| | (c) 50% of Lateral "B" Slope Protection 15,062.5 sq. ft. at $3.00 sq. ft. | 45,187.50 |
| | Gabion Weirs 42.5 CY at $100 CY | 4,250.00 |
| 3. | Clearing and grubbing 21.27 Acres at $1509 per acre | 32,096.43 |
| 4. | Seeding and mulching 21.27 acres | 17,836.35 |
| 5. | A contingency fund of 10% | 48,772.32 |
| | (a) Sub-total | 536,495.60 |
| 6. | Engineering fees at 6% | 32,189.74 |
| 7. | Sub-total | 568,685.34 |
| 8. | A permanent credit for 21.27 acres to be used in constructing the ditch. This credit to be allowed August 4, 1982 | 95,715.00 |
| 9. | A permanent credit for engineering fees paid by plaintiff-buyer exclusive of fees spent in connection with litigation. This credit to be allowed August 4, 1982 | 12,397.52 |
| 10. | Grand Total | $676,797.86 |

The Chancellor found after construction of the provisions of the promissory note that the plaintiff-buyer was entitled to credits up to the maximum limit of $568,-685.34 when those costs were actually incurred or experienced. He further found that the anticipated amount to be spent by plaintiff-buyer for the raising of the property out of the flood plain, pursuant to a concept of a series of lakes, dams, and spillways, amounted to $820,189.50. Relating this sum to the maximum sum allowable ($568,685.34), the Chancellor determined that the mathematical percentage the plaintiff-buyer would be entitled to is a credit of sixty-nine per cent for every dollar spent by plaintiff-buyer to bring the property out of the flood plain up to the maximum allowable sum.

Defendant-seller states five issues. The first complains that the method approved by the Chancellor in raising the land from the flood plain was erroneous and resulted in excessive credits in that it included the use of Gabion Weirs and Gabion Pads for erosion control.

The contract and the promissory note make no provision for the method by which the ditch is to be constructed to raise the land above the flood plain. In such case, the law of Tennessee implies that the method must be a reasonable one.

Two plans were presented to the Chancellor for removing the land from the flood plain, both plans presented by experts, and the Chancellor found the plan proposed by the plaintiff-buyer to be the reasonable plan.

Specifically the Chancellor found:

... This property lies in an area which the Court can take judicial knowledge of, as well as the proof addressing itself to it, and one of the more prosperous areas of this county ... and the Court concludes that it was the intent of the parties that there be the type of construction to comport with the 100 year flood plain that would allow this property to be marketable to this higher class clientele, and by class, I mean economic class ... it is this Court's opinion that by the construction of the contract that it was the intent of the parties that there be a stable construction ... towards that end, the Court has to evaluate the credibility of the witnesses in terms of which method best meets this intended need as evidenced by this contract.

■ In construing the contract and determining the reasonable and proper method of effecting the pertinent provisions of the contract, the Chancellor must look to, among other things, tne circumstances surrounding the subject matter of the contract and the parties, the nature of the business of the parties, and the motives and objectives of the parties in entering into the contract. *Dearing v. Brushcreek Coal Co.*, 182 Tenn. 302, 186 S.W.2d 329, 331 (1945); *McNairy v. Thompson*, 33 Tenn.

142, 150 (1853); *Stovall v. Dattel*, 619 S.W.2d 125, 127 (Tenn.Ct.App.1981); *Ohio Casualty Ins. Co. v. Travelers Indemnity Co.*, 493 S.W.2d 465, 467 (Tenn.1973).

The Chancellor expressly found the plaintiff-buyer's experts to be more credible.

For seller-defendant to prevail on this issue, it must be shown that the evidence before the Chancellor preponderated against the Chancellor's finding. Tennessee Rules of Appellate Procedure 13(d). We have carefully reviewed the record and though the Chancellor has approved a method that is more expensive than that used in most parts of Shelby County, we are satisfied that the evidence does not preponderate against the Chancellor's finding that plaintiff-buyer's expert's method of raising the land above the flood plain is the reasonable one in light of the circumstances surrounding the subject matter of the contract, the location of the property, the business of the purchaser of the property, and the objectives and motives for which the property was purchased. Each case stands on its own bottom.

■ The defendants-sellers contend that the Chancellor erred in allowing credits for 50% of the costs of Lateral B as the evidence preponderates against the allowance of *any* credits for Lateral B of Fletcher Creek.

We think there is merit to this contention. The Chancellor had before him the Corps of Engineers map of the Fletcher Creek Flood plain. He found that the parties were bound by the Corps of Engineers plan because they relied upon it whether they saw it or not. The parties have stipulated in this Court that exhibit No. 19 which is an aerial photograph of the property and surrounding territory is what the experts testified from and the Chancellor found to be binding upon the parties.

The only evidence that supports a finding that Lateral B is included in the Corps of Engineers flood plan is a line drawn in pen upon this aerial map photograph. The expert testimony of all engineers that testified on the matter was that the Corps of

Engineers ignored Lateral B as a part of the Fletcher Creek Flood plan.

Mr. Hargraves, the expert for the plaintiff-buyer, testified that there were 5.16 acres in his total plan for Lateral B and in his opinion that flow water from Lateral B contributed to the flood plain, however, he testified that the Corps of Engineers flood plan was not in agreement with his opinion.

Mr. Hargraves testified as follows:

A. No, sir. The way I interpret that flood map was they didn't take into account Lateral B, which is not to say that the problem is not there.

\* \* \*

Q. According to the Corps of Engineers' map, from approximately this point at the elbow where I'm pointing now northwestwardly, the rest of it is out of the flood plain.

A. Yes, sir. But they didn't take into account Lateral B at all, they didn't even— it's like it was not even there.

Q. Well, what is the standard for deciding—what standard under the contract are we using? Whose 100-year flood plan is it?

A. In the contract?

Q. Yes, sir. What is the 100-year flood plain? Who determined the 100-year flood plain?

A. The Corps of Engineers.

Q. So if their maps say it's not in there—

A. (Interposing) You would have to go by that, I assume.

Q. So when you recommend step-down weirs and gabions and dirt work along sixty percent of this lateral, you're doing it is contravention of the flood plain map as established by the Corps. You're doing it on your own. In other words, it's not in the 100-year flood.

A. Yes, sir.

Q. So that's your interpretation, not the Corps' interpretation.

A. That's correct.

Mr. Robert Sweeney the expert for the defendants-sellers testified as follows:

Q. (By Mr. Jones) Now, again referring to Lateral B and referring to the Corps of Engineers' propul (sic) method. Look at that if you will. Is Lateral B for purposes of the Corps study, excluded from the 100-year flood plain?

A. Yes, it is. There's a small indentation in the flood plain shown here, which is a backwater backup into the Lateral B basin, but Lateral B itself does not show up on here.

Q. Is it ignored then?

A. Yes.

Q. Or disregarded by the Corps of Engineers in the 100-year flood plain?

A. Yes, it is.

Q. Is that why you did not calculate any dirt work for that lateral?

A. Yes.

There is no proof in the record that Lateral B is part of the published Corps of Engineers' one hundred flood plain other than being affected by possible backwater from a flood in Lateral A in a portion of Lateral B. Therefore, the proof preponderates against the judgment of the Chancellor in allowing credits for expense for improving 50% of Lateral B.

Accordingly, all items of credits applicable to Lateral B must be disallowed. These credits are:

| | |
|---|---|
| Earthwork (50% × 30,400 cu. yd. × 1.25) | $19,000.00 |
| Invert and Slope Protection (15,062.5 s.f.) × (3.00) | 45,187.50 |
| Gabion Weirs (42.5 cu. yd.) × ($100.00) | 4,250.00 |
| Clearing and Grubbing (50%) × (5.16 acres) × ($1509.00) | 3,893.22 |
| Seeding and Mulching (50%) × (5.16 acres) × ($838.57) | 2,163.51 |
| SUB TOTAL | 74,494.23 |
| Contingency @ 10% | 7,449.42 |
| Engineering @6% | 4,916.62 |
| Maximum Credit on Lateral B excluding cost of 2.58 acres of land | $86,860.27 |

■ The defendants-sellers contend that the Chancellor erred in his interpretation of the provisions of the contract and the

promissory note in allowing a permanent credit against defendants-sellers' promissory note for the land used in constructing the ditch totaling 21.27 acres.

The ditch approved by the Chancellor contained a total of 21.27 acres. The ditch designed and proposed by the defendants-sellers contained a total of only 12.9 acres. As acknowledged by the defendants-sellers' engineer, it was the narrowest ditch possible to hold the 100 year flood. Before any improvements were done to Fletcher Creek, the unimproved creek contained a total of 3.2 acres.

At trial, and in their brief, defendants-sellers have insisted that the only credit to which plaintiff-buyer was entitled was a credit for the additional acreage that would be in the ditch after it was improved. Defendants-sellers maintain that no credit should be given for any acreage already in the unimproved ditch.

The Chancellor ruled that the language of the contract and the promissory note called for a credit for all acreage in the improved ditch. He further ruled that the agreement of the parties called for the amount of this credit to be subtracted from the amount owed on the promissory note once the amount of the credit was determined, which date he held to be August 4, 1982.

With respect to when the credit should be allowed, the promissory note provides that "Payment of this note shall also be reduced when it is determined how much land is in the ditch that must be constructed" ... Additionally, the promissory note provides that once the amount of acreage in the ditch is determined, it "will be multiplied by $4,500.00 per acre and then subtracted from the amount of this note."

Appellants' contention that credit should be allowed only for the *additional* land that was used in the improving of the ditch has no merit. However, the Chancellor's credit of 21.27 acres should be reduced by 2.58 acres as a result of his inclusion of that amount in Lateral B. The permanent credit of $95,715.00 allowed as of August 4, 1982 will be reduced in the amount of $11,-610.00. Otherwise, the judgment of the Chancellor is affirmed on this issue.

■ The design and costs approved by the Court include a ten percent contingency charge. (Item No. 5). The defendants-sellers insist that the Chancellor erred in allowing this contingency fee as a credit under the circumstances.

We agree.

The evidence is clear that under normal circumstances a contingency fee is figured into estimates of materials and work to be done in construction work such as was estimated in this case, however, it was understood at the outset that the work being estimated here would not be done. Contingency funds are a fudge factor to allow for increased costs that may or may not arise. If they do not arise the fund is not used. It being understood by the parties and the Chancellor at the hearing that this work would not be done and that a system of lakes would be built, a contingency fee is unwarranted. There will be no contingency as to the work and materials estimated.

This Court having previously disallowed a portion of this contingency fee in the amount of $7,449.42 in it's disposition of the credits pertaining to Lateral B, the remaining sum of $41,332.58 will be disallowed.

■ Lastly, the defendants-sellers complain of the method devised by the Chancellor in his allowance of credits based at sixty-nine percent of funds expended by the plaintiff-buyer against future installments due on defendants-sellers on their promissory note in the development of a series of lakes to raise the one hundred year flood plain.

As previously stated, it was known from the beginning of the trial that the plaintiff-buyer was going to use an engineering approved concept of several lakes to raise the land out of the 100 year flood plain. It was also known, that this concept would cost more than the ditch concept (the concept upon which the case was tried). The

Chancellor stated during the course of the proceedings and the plaintiff-buyer agreed it would not be appropriate to charge the entire costs of the lake development as a credit. The Chancellor therefore used a mathematical formula of comparing the ditch costs to the lake costs and found the ditch costs would be sixty-nine percent lake cost. As the lakes were developed, the Chancellor held sixty-nine percent of lake cost was to be allowed as a credit towards the reduction of the note. The Chancellor specifically held, however, that under no circumstances was the total credit to be allowed to exceed the $568,685.34 amount found to be the appropriate amount for using the ditch concept.

Though the master had devised a different plan, we are not prepared to say that the method devised by the Chancellor was erroneous. Our action in disallowing certain credits will, of course, reduce the amount of the percentage.

Accordingly, item 7 in the amount of $568,685.34 will be reduced in the amount of $128,183.17, that is, that item will be adjusted to $440,502.17. Item No. 8 in the amount of $95,715.00 will be reduced in the amount of $11,610.00, that item to be $84,-105.00 as of August 4, 1982.

The costs in this Court will be equally divided by the parties for which let execution issue, if necessary.

As modified the case is remanded to the Chancery Court of Shelby County for any necessary further action not inconsistent with this opinion.

NEARN, P.J. (W.S.), and HIGHERS, J., concur.

ORDER ON PETITION TO REHEAR

After due consideration of appellants' Petition to Rehear, it is respectfully denied.

/s/ McLemore
McLEMORE, Special Judge
/s/ Nearn
NEARN, P.J., W.S.
/s/ Highers
HIGHERS, J.